ERNEST H. STRETTON AND EDITH STRETTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stretton v. Commissioner
Docket No. 878-72.
United States Tax Court
T.C. Memo 1975-83; 1975 Tax Ct. Memo LEXIS 284; 34 T.C.M. (CCH) 417; T.C.M. (RIA) 750083; March 31, 1975
William P. Chirsty, Jr., for the petitioners. John E. White, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in the Federal income taxes of petitioners and an addition to tax as follows: Addition to Tax
Year
Deficiency
§ 6654, IRC
1954
1961
$ 5,138.42
1962
3,024.40
1963
39,972.97
1964
67,709.14
$ 168.06
1965
13,811.41
Respondent also determined additions to tax against Ernest H. Stretton in *285 the following amounts: Addition to Tax
Year
§ 6653(b), IRC
1954
1961
$ 2,569.21
1962
1,512.20
1963
19,986.49
1964
33,854.57
1965
6,905.71
We must decide whether petitioners understated their taxable income on each of the joint Federal income tax returns filed for the years in issue; and, if so, whether any part of the underpayment of tax was due to the fraud of petitioners. FINDINGS OF FACT The stipulation of facts and exhibits appended thereto are incorporated herein by this reference. Petitioners, Ernest H. Stretton (Ernest) and Edith Stretton (Edith), are husband and wife. They filed a joint Federal income tax return with the district director of internal revenue, Syracuse, New York, for each of the years 1961 and 1962; with the district director of internal revenue, Buffalo, New York, for the year 1963; and with the district director of internal revenue, Albany, New York, for each of the years 1964 and 1965. They resided in Canton, New York, when the petition herein was filed. Petitioners have two children: Carole, born on May 26, 1939, and Ernest II, born on March 20, 1942. Ernest has been practicing medicine in Canton since 1938. *286 [1] His office is located in his residence. During the years in issue Ernest customarily began his working day by consulting with his secretary at 9:00 a.m. He would then make any scheduled house calls and visit the E. J. Noble Hospital to make rounds. Returning to his office at approximately 2:00 p.m., he would receive patients during the balance of the afternoon. He was available for evening house calls; and he had office hours two or three evenings a week. On Thursdays and Sundays he had no office hours and on Saturdays he had morning office hours only. Ernest employed a single office assistant, his secretary, Helene Infantine (Helene). She worked from 9:00 a.m. to 1:00 p.m. and from 3:00 p.m. to 6:00 p.m. on weekdays and from 9:00 a.m. to 1:00 p.m. on Saturdays. She did not work evenings. It was the custom of the office that the receipts and expenditures of Ernest's practice be recorded in a daily log. The task of recording payments received directly from patients during daytime hours was shared by Ernest and Helene. Payments *287 received through the mail were entered by Helene and those received during evening hours were recorded by Ernest. The figures entered in the log were used by Ernest in preparing petitioners' joint Federal income tax returns. [2] Ernest maintained a business checking account (No. 1-2-111104) at the Saint Lawrence County Bank (County Bank). During the years in issue, deposits of currency were made to this account in the following amounts: 1961
1962
1963
1964
1965
$ 1,000
$ 950
$ 3,000
$ 2,000
$ 1,000
900
800
3,000
1,100
500
700
1,000
1,500
1,500
1,000
1,500
150
4,600
2,000
3,000
1,000
2,000
1,000
2,000
2,000
4,000
1,500 Checks [3] in the following amounts were also deposited to this account: Total
Year
Deposits
1961
$ 9,593.61
1962
13,436.42
1963
9,186.19
1964
7,959.76
1965
15,137.64 The year-end balances in this account for the years 1960 through 1965 were: $ 769.40, $ 407.64, $ 1,049.87, $ 529.12, $ 174.34 and $ 588.37, respectively. Disbursements from the account in the years 1961 through 1965 included personal living expenditures in the following amounts: $ 1,034.67, *288 $ 1,561.14, $ 1,923.26, $ 1,664.62, and $ 1,211.15. On August 30, 1962, Ernest opened a savings account (No. 19914) in his name at the Canton Savings & Loan Association, making an initial deposit of $ 3,600. Additional deposits of $ 2,400 and $ 1,200 were made on December 6, 1962, and January 22, 1963, respectively. On May 14, 1963, this account was closed and the balance of $ 7,256 was deposited in account No. 20211, opened in the name of Carole I. Stretton. On July 5, 1965, account *289 No. 20211 was closed. On November 10, 1955, petitioners opened a joint savings account (No. 5713) at the First National Bank of Canton (FNB). The single deposit made to the account within the period under consideration was made on May 10, 1962, and consisted of over 40 checks in amounts ranging from $ 15 to $ 232, totalling $ 4,040.01. The year-end balances in the account for the years 1960 through 1965 were: $ 33,475.09, $ 7,509.33, $ 5,403.08, $ 4,185.81, $ 4,333.58 and $ 4,508.64, respectively. Petitioners failed to report $ 434.49 and $ 174.74 of interest earned on this account in the years 1961 and 1962. Edith had a checking account at FNB which contained the following balances as of the close of the years 1960, 1963, 1964 and 1965: $ 71.29, $ 130.22, $ 117.27 and $ 117.27. Disbursements from the account included personal expenditures in the following amounts: $ 109.29 and $ 269.78 in 1961 and 1963, respectively. On April 18, 1960, petitioners opened a joint savings account (No. 65437) at the First Trust & Deposit Company, Syracuse, New York (First Trust). Only in 1961 and 1962 of the years in issue were deposits made to this account. These included three large deposits *290 of currency: $ 5,700 on June 28, 1961, $ 3,000 on November 30, 1961, and $ 3,000 on December 1, 1961. The balances in this account as of December 31, 1960 through 1965, were $ 24,125.81, $ 60,557.44, $ 70,272.91, $ 65,259.97, $ 58,317.22, and $ 47,148.34. Petitioners failed to report interest in the amount of $ 1,167.34 earned on this account in 1961. On September 17, 1960, petitioners opened a joint checking account (No. 390-037910) at First Trust. As of the close of the years 1960 through 1965, the balances in the account were $ 10,753.58, $ 4,515.57, $ 31.30, $ 2,858.91, $ 1,717.15 and $ 36.49, respectively. In the years 1961 through 1965 disbursements from this account included personal living expenses of petitioners in the following amounts: $ 5,968.52, $ 4,484.62, $ 4,459.60, $ 10,018.76 and $ 6,224.16, respectively. On October 26, 1944, petitioners rented a joint safe deposit box (No. 372) at FNB. They continued to lease the box until April 16, 1963. Two days thereafter Ernest opened a checking account (No. 390-062028) at First Trust. Deposits made to this account during the years in issue totalled: Year
Deposits
1963
$ 58,112.64
1964
82,362.64
1965
45,422.81
*291 These deposits consisted in part of a large number of checks--receipts of Ernest's medical practice--a small portion of which had not been recorded in Ernest's office log. [4] Also deposited to the account were money orders and cashier's checks purchased by Ernest and made payable to him, and currency: Money Orders &
Year
Cashier's Checks
Currency
1963
$ 16,000
$ 12,200
1964
28,000
3,000
1965
13,600 Only in rare instances did Ernest draw checks on this account. [5] Those drawn in 1964 totalled $ 1,155 in amount; those drawn in 1965, $ 151. Prior to 1961 Ernest acquired 750 shares of American Telephone & Telegraph Company (AT&T) stock at a cost of $ 37,387 and acquired another 2,001 shares jointly with Edith at a cost of $ 94,212.41. These purchases *292 were paid for in part with the proceeds of a gift of $ 30,000 which petitioners received from Edith's parents in 1948. On April 11, 1961, Ernest and Edith acquired 138 additional shares of AT&T for $ 11,878, and on April 6, 1964, acquired another 144 shares for $ 14,400. The cost of the shares purchased in 1961 and 1964 was paid with money orders and cashier's checks. On October 12, 1964, Ernest acquired 1,515.152 shares of the capital stock of Investors Mutual, Inc. (Investors) in trust for Edith at a cost of $ 20,000. On November 9, 1964, he acquired an additional 840.336 shares in trust for her at a cost of $ 19,000. These purchases were made with $ 100 bills. Ernest also purchased 100 shares of stock in County Bank for $ 5,500 on February 14, 1963, and in May of that same year bought an additional 83 shares for $ 5,230. The following is a schedule of petitioners' automobile purchases pertinent to this controversy: Description of Car Purchased
Description of Car Purchased
Name & Address
Date of
of Dealer
Purchase
Inv. Price
Year
Make
Mace Motors, Inc.
4/5/60
$ 4,691.23
1960
Oldsmobile
Canton, N.Y.
Fay Motors, Inc.
4/30/59
1959
Vauxhall
Massena, N.Y.
Mace Motors, Inc.
1/14/61
2,795.00
1961
Olds F-85
Fay Motors, Inc.
4/14/62
2,925.00
1962
Pontiac
Tempest
Mace Motors, Inc.
6/4/62
4,854.34
1962
Olds 98
Mace Motors, Inc.
1/22/65
2,571.63
1965
Olds F-85
Mace Motors, Inc.
12/17/65
5,394.00
1966
Olds
Toronado
*293 Description of Car Purchased
Less Trade-In Allowance
Name & Address
Net Cash
of Dealer
Amount
Year
Make
price
Mace Motors, Inc.
$ 1,566.23
1955
Oldsmobile
$ 3,125.00
Canton, N.Y.
Fay Motors, Inc.
Massena, N.Y.
Mace Motors, Inc.
1,095.00
[1] 1,700.00
Fay Motors, Inc.
825.00
1959
Vauxhall
2,100.00
Mace Motors, Inc.
2,554.34
1960
olds
2,300.00
Mace Motors, Inc.
1,171.63
1962
Pontiac
1,400.00
Tempest
Mace Motors, Inc.
1,590.00
1961
Olds F-85
[2] 3,800.00
Aside from the items to which we have already alluded, petitioners' personal expenses included: 1961
1962
1963
1964
1965
Deposits to Carole's
check-
ing account at FNB
$ 800.00
$ 190.00
$ 4,865.00
$ 3,441.26
$ Amounts disbursed by
cash,
money order or cashier's
check:
Sapphire ring
1,895.00
Carole's wedding
820.00
Education
665.00
3,500.00
7,500.00
3,300.00
5,975.0
Traveler's checks
801.00
Food & household
1,560.00
1,560.00
1,560.00
1,560.00
1,560.0
expenses
Clothing
958.50
1,639.09
774.90
*294 An obligation of $ 1,000 arising out of the purchase of gasoline and tires was discharged with a money order which Ernest purchased on August 25, 1961; premiums of $ 1,200 on insurance policies (other than life insurance) were paid with a money order purchased on December 29, 1961; a pleasure boat was purchased with a $ 1,500 money order in 1961; and a $ 999 obligation incurred in connection with the improvement of certain of Ernest's real estate was discharged by money order in 1963. On February 11, 1965, a special agent was assigned to investigate petitioners' income tax returns for the years 1961 through 1964; later the scope of this investigation was extended to include 1965. The agent first met with Ernest at the latter's office on December 7, 1965. After introducing himself and explaining to Ernest his constitutional rights, the agent made inquiry as to the type of records which Ernest kept and how he prepared his Federal income tax returns. Ernest thereupon described the manner in which the receipts and expenditures of his medical practice were recorded, and surrendered his office logs to the agent. The agent met with Ernest for the second time on January 6, 1966, again *295 at Ernest's office. The agent then asked Ernest how he disposed of the receipts of his medical practice. Ernest replied that he used the currency to pay his personal expenses and deposited all the checks to account No. 1-2-111104 at County Bank. At a subsequent interview, conducted on January 27, 1966, Ernest gave the agent the records relating to this account. An analysis of these records indicated that, except in rare instances, medical receipt checks deposited to the account were in amounts not exceeding $ 20. When he was confronted with this fact at a later interview, Ernest replied that he had cashed the larger checks and used the proceeds to defray living expenses. When he was asked if he had deposited medical receipts in any other bank accounts, Ernest insisted that he had not. In the course of the interview of January 6, 1966, the agent asked Ernest to enumerate his and Edith's bank accounts. Ernest replied by referring to account No. 5713 at FNB and account No. 65437 at First Trust, as well as to account No. 1-2-1111-4 at County Bank; but he failed, then and at subsequent conferences with the agent, to disclose the existence of accounts No. 390-062028 and No. 390-037910 at *296 First Trust. The agent became aware of these accounts only when, at his behest, another of respondent's agents asked First Trust to produce the records of any accounts which petitioners may have had with that bank. At the interview of January 6, 1966, inquiry was made as to the securities which petitioners owned. Ernest replied that his wife owned 6,000 shares of AT&T stock which she had acquired with the proceeds of a cash gift received from her parents. [6] He also acknowledged ownership of 100 shares of stock in both One William Street Fund [7] and County Bank. Ernest was unable to recall the extent of his interest in Investors; but at a subsequent interview he advised the agent that in 1964 he had purchased a block of Investors shares with the proceeds (about $ 14,000) of two endowment policies which he had held with the Equitable Life Assurance Society (Equitable). He described the transaction in detail, explaining that he had cashed the check which he had received from Equitable *297 in respect of the two policies and used the proceeds to purchase the Investors shares from a man in Potsdam, New York. However, further investigation by the agent disclosed that the check issued by Equitable had in fact been deposited to account No. 390-062028 on July 29, 1964. At the interview of January 6, 1966, the agent also questioned Ernest in respect of the automobiles which Edith and he owned. Ernest replied that he owned one, a 1962 Oldsmobile, and that Edith owned none. A subsequent investigation by the agent of the records of Mace Motors disclosed that three weeks prior to the interview Ernest had purchased a 1966 Oldsmobile Toronado for cash. On January 6, 1966, Ernest also owned a 1965 Oldsmobile F-85. Despite an inquiry as to furs and jewelry which may have been acquired from 1961 through 1965, Ernest failed to disclose his purchase of a sapphire ring for cash in 1964. During the interview of January 6, 1966, the agent asked if at any time in the years 1961 through 1964 Ernest had kept cash on hand in significant amounts. Ernest initially replied that he never kept more than $ 1,000 of undeposited cash; but the bank records which Ernest surrendered on January 27, 1966, clearly *298 indicated that he had made cash deposits to account No. 1-2-111104 in amounts exceeding $ 1,000 on several occasions during the years in issue. When he was confronted with this at a subsequent interview, Ernest insisted upon the essential accuracy of his initial response; but he acknowledged that on several occasions he had accumulated cash in amounts exceeding $ 1,000 in a drawer at his home. With these funds, he claimed, the cash deposits were made. Later in the investigation, Ernest advised the agent that prior to April 16, 1963, it had been his practice to accumulate personal savings in safe deposit box No. 372, pending a decision as to how these funds should be invested. He claimed to have had $ 46,000 of personal savings in the safe deposit box as of that date. Ernest further advised the agent that after his mother-in-law's death in 1952 he had acquired possession of her estate consisting of $ 134,000 in cash and had secreted it in safe deposit box No. 372, together with his personal savings. Ernest went on to say that after the safe deposit box was opened on April 16, 1963, he kept some of the cash which had been concealed therein at his home and put the rest in a safe deposit *299 box at County Bank. He claimed to have used a portion of this $ 180,000 hoard in educating his children and to the balance he traced the following investments and bank deposits: 1963 - Deposits to checking account
No. 390-062028
$ 28,200
1964 - Deposits to checking account
No. 390-062028
31,000
Purchase of 144 shares of
AT&T stock
14,400
Purchase of 2355.488 shares of
Investors stock
39,000
1965 - Deposits to checking account
No. 390-062028
13,600
[8] $ 126,200
Ambrose and Edith Kelly, Edith's parents originally resided in Brooklyn, New York, where Ambrose was employed by Oppenheim & Collins, a department store. Edith Kelly moved to Canton in 1938 to live with petitioners. Ambrose followed her there after his retirment in 1942. He died intestate on May 29, 1950. His widow died two years thereafter. [9]
Edith Kelly left a will which provided that Edith be *300 appointed executrix of her estate and that her assets be divided equally between her two children, Edith and Irene K. Remmers (Irene). Ernest maintained that it was the Kellys' abiding fear that after their deaths some of their assets might be acquired and then squandered by Irene's husband; and that it was in an effort to forestall such an occurrence that he had concealed both Edith's and Irene's inheritance, first in his safe deposit box and then, purportedly on the advice of an officer of First Trust, [10] in account No. 390-062028. [11]
Seeking to verify Ernest's story, the agent interviewed Irene on October 25, 1967. He questioned her as to the value of Edith Kelly's estate and as to the amount of Ambrose's earnings; but *301 she proved to be uninformative. [12] The agent continued his investigation by making inquiries as to Ambrose's earnings at the personnel offices of the corporations which had acquired Oppenheim & Collins and another of Ambrose's former employers. Neither corporation could provide the agent with the information which he sought. On their returns for the years in issue petitioners reported taxable income in the following amounts: 1961
$ 17,014.00
1962
20,146.00
1963
21,112.70
1964
24,411.00
1965
21,769.72 Utilizing the net worth method, respondent determined that they realized taxable income in the following amounts: 1961
$ 29,879.61
1962
28,030.64
1963
88,937.46
1964
138,778.31
1965
53,335.68
All of the items affecting respondent's net worth computations have been stipulated save two. Only one of these, the amount of undeposited cash in the possession of petitioners on December 31, 1960, is now in controversy. On May 15, 1970, Ernest was indicted in the United States District Court, Northern District of New York, for *302 having willfully attempted to evade Federal income tax by filing false and fraudulent returns for the years 1963, 1964 and 1965. On December 21, 1970, Ernest pleaded guilty to the second count of the indictment, which related to the year 1964. The plea was accepted by the court, and the counts relating to 1963 and 1965 were dismissed. Statutory notice of the deficiencies and additions to tax at issue herein was dated November 23, 1971. OPINION Respondent contends that owing to a willful attempt on the part of Ernest to evade Federal income tax, petitioners failed to report in full the taxable income which they realized during the years in issue. Respondent has the burden of proving fraud by clear and convincing evidence. . By virtue of Ernest's plea of guilty to the second count of the indictment of May 15, 1970, and the judgment of conviction resulting, we hold, collateral estoppel applying, that the return filed for 1964 was fraudulent; and that Ernest may properly be charged with an addition to tax under section 6653(b) in respect of that year. , affd. *303 (C.A. 4, 1965); . [13]
Net worth computations constitute evidence of taxable income independent of the records which the taxpayer has compiled. [14] (C.A. 7, 1956), affirming a Memorandum Opinion of this Court, certiorari denied ; *304 (C.A. 3, 1957), modifying a Memorandum Opinion of this Court; (C.A. 6, 1957), certiorari denied . Respondent's net worth computations show that in each of the years in issue petitioners realized taxable income in an amount substantially in excess of that which they reported. When, as in this instance, net worth computations indicate that on the returns filed for several successive years taxable income was substantially understated, the computations constitute some evidence of fraud. (C.A. 4, 1961), affirming a Memorandum Opinion of this Court; (C.A. 5, 1962), affirming a Memorandum Opinion of this Court. In reconstructing petitioners' taxable income under the net worth method, respondent did not assume that prior to 1961 petitioners accumulated a considerable amount of cash which they deposited, invested or expended during the years in issue. Petitioners have sought to impugn the evidentiary value of respondent's *305 computations by contending that in 1963, 1964 and 1965 they made overt use of a cash hoard acquired prior to 1961, consisting of an inheritance of $ 134,000 and $ 46,000 of personal savings. Respondent must negate this contention if the evidentiary value of the net worth computations is not to be vitiated. ; (C.A. 2, 1963), affirming per curiam a Memorandum Opinion of this Court. The record discloses that petitioners had considerable sums invested in securities and deposited in savings accounts. This being the case, we think it quite improbable that pending a decision as to how to invest any of their personal savings, petitioners would have been content to forego a return on the funds by keeping them in a safe deposit box. Furthermore, prior to alleging the existence of a cash hoard, Ernest maintained that *306 aside from the several occasions on which he had accumulated large amounts of cash in a drawer at his home for deposit in his business checking account (No. 1-2-111104), he had never kept more than $ 1,000 in cash at any location. Ernest's statements to this effect, made to an agent investigating him for tax fraud, cannot be reconciled with his self-serving, uncorroborated testimony as to the $ 46,000. We are therefore satisfied that petitioners did not accumulate substantial amounts of personal savings in a safe deposit box prior to 1961. ; (C.A. 5, 1958); Cefalu v. (C.A. 5, 1960), affirming a Memorandum Opinion of this Court; As respondent relies upon net worth computations as evidence of fraud, he must have investigated thoroughly the explanations of those computations inconsistent with fraud, which petitioners have advanced. Holland v. . Petitioners attribute a sizeable portion of the net worth increases which they appear to *307 have enjoyed during the years in issue to the overt use of $ 134,000 in cash left by Edith Kelly; and they contend that in connection with Edith Kelly's estate, respondent did not investigate to the extent required by Holland the sources from which the Kellys derived assets during their lifetime: earnings, gifts and inheritances. We cannot agree. Respondent is required to investigate leads offered by petitioners only within the limits of reason. (C.A. 2, 1955). Further investigation along the lines suggested by petitioners would have been of limited usefulness in determining the size of Edith Kelly's estate were the information which respondent might have elicited in the course of such an investigation not supplemented by evidence of the Kellys' habits of expenditure and consumption. We fail to see how respondent might reasonably have procured such supplemental information without assistance from petitioners, assistance which there was no reason to believe would have been forthcoming. United States v. (C.A. 2, 1955), affd. . It is therefore our *308 opinion that respondent's investigation of Edith Kelly's estate complied with the standard set forth in Holland. (C.A. 10, 1956), certiorari denied . The affirmative evidence introduced by respondent does not conclusively disprove petitioners' contention respecting Edith Kelly's estate. Nonetheless we are not bound to accept that contention; for upon due consideration of the entire record we find it unworthy of credence. ; (C.A. 3, 1959), affirming , certiorari denied ; (C.A. 5, 1953), affirming a Memorandum Opinion of this Court. Aside from Ernest's self-serving testimony there is little in the record tending to establish the truth of petitioners' contention. See . There is ample evidence that at times the Kellys did accumulate some cash: the $ 30,000 gift given to petitioners in 1948; the deposits *309 which Edith Kelly made to her checking account in the seven months preceding her death. But such evidence neither proves nor disproves that at the time of her death Edith Kelly was possessed of a substantial cash hoard. The record discloses that Ambrose Kelly died intestate, and that in making her will, his widow failed to include among its provisions any of the devices commonly used to preserve estates from depredation by prodigal heirs. We therefore consider it quite improbable that toward the end of their lives the Kellys were possessed of a sizeable cash hoard which they were eager to preserve from waste by Irene's husband. Were we to assume the contrary, we would nonetheless be disinclined to believe that sophisticated persons such as petitioners would have conducted themselves in the irregular manner described by Ernest in his testimony. And while it bears acknowledging that on April 15, 1966, an account was opened in the name of Edith Kelly's estate with a deposit of $ 95,000, it must also be recognized that the account was not opened until after Ernest had been informed of the investigation which culminated in this litigation. Wholly apart from respondent's net worth computations, *310 the record is replete with affirmative evidence of conduct on the part of Ernest, the likely effect of which would be to conceal or mislead. In this connection we note first of all the several specific instances of failure on the part of Ernest to record medical receipt checks in his office logs and to report interest income earned by petitioners on their joint savings accounts. Evidence of such conduct is indicative of fraudulent intent. ; . On several occasions Ernest transacted business in cash under circumstances in which checks would normally be utilized as the medium of exchange. Given the relative facility, commonly recognized, with which cash transactions can be concealed, we find in this aspect of Ernest's conduct of his affairs further evidence of fraudulent intent. In the initial phases of the investigation Ernest sought to convince the agent that it had not been his practice to accumulate large amounts of undeposited cash during the years 1961 through 1964. The number of transactions in which Ernest participated *311 through the media of cash, money order and cashier's check constitutes clear evidence to the contrary. When he subsequently claimed to have possessed a large amount of cash, Ernest attempted to ascribe it to sources other than receipts taxable in the years in issue. As we have stated, we are wholly unconvinced by Ernest's explanation of his cash accumulations; and in his lack of candor we perceive further evidence of his attempts to evade Federal income tax. . In the course of the investigation Ernest was asked to make full disclosure of his and Edith's major assets: bank accounts, securities, automobiles and jewelry. Mere confusion or lapse of memory will not suffice to explain the inaccuracy of Ernest's responses.[15] Rather it appears that he framed some of his responses so as to conceal the full extent of his assets. Such conduct further substantiates respondent's contention. . *312 In our opinion, the record herein admits of no other holding but that Ernest willfully attempted to evade income tax in the years 1961, 1962, 1963 and 1965 by filing fraudulent returns. [16]
In proving fraud, respondent need not demonstrate precisely the amount of taxable income which was not reported. We might therefore make some adjustment in respondent's net worth computations without impugning their value as evidence of fraud. (C.A. 7, 1948), certiorari denied ; (C.A. 8, 1956), certiorari denied . In this instance some allowance for undeposited cash might at first seem appropriate; for the clear import of respondent's net worth computations is that petitioners' taxable receipts varied markedly from one year to the next; and the record discloses no reason as to why this might have been. The record, however, is wholly devoid of credible evidence which might have warranted our making such an adjustment. [17] As deficiencies determined with reference to net worth computations *313 are presumptively correct, they must therefore be sustained. ; (C.A. 1, 1960).[18]
Decision will be entered under Rule 155.
Footnotes
1. A general practitioner, Ernest nevertheless devoted a substantial portion of his time to the practice of obstetrics during the years in issue.↩
2. Petitioners' return for the year 1965 was prepared by a certified public accountant who had not worked for petitioners on prior occasions. The accountant prepared the return from a work copy of Schedule C submitted by Ernest, copies of information returns relating to petitioners' receipts of dividends and interest, and certain supplementary information. He did not personally examine any of the records pertaining to Ernest's medical practice; nor did he discuss the return with Ernest, save in respect of a deduction relating to the settlement of a malpractice suit. ↩
3. With few exceptions, checks received as payment for medical services and deposited to this account were in amounts not in excess of $ 20.↩
4. Analyzing a portion, selected at random, of the nearly 800 checks deposited to account No. 390-062028 from 1963 through 1965, the agent discovered that of the checks which he traced to their source, approximately 200 were medical receipts. Of these 200 checks, 15, totalling $ 2,595 in amount, were not recorded in Ernest's office log. ↩
5. In 1964, 3 checks were drawn on this account; in 1965, only 2.↩
1. Payment was made with a money order (#23258) purchased by Ernest on January 13, 1961, from FNB. ↩
2. Payment was made in cash.↩
6. Edith's parents gave petitioners $ 30,000 in cash in 1948. ↩
7. Ernest purchased 100 shares of stock in One William Street Fund prior to the years in issue and held them throughout that period.↩
8. Ernest testified to this effect at trial.↩
9. On October 5, 1951, Edith Kelly opened a checking account at FNB with a deposit of $ 500. In the final 7 months of her life she made 3 more deposits to this account totalling $ 2,000 in amount, and drew on the account on over 30 occasions.↩
10. The agent made no effort to contact this bank officer; nor, unaccountably, was he summoned by either party to give testimony at trial. ↩
11. The record discloses that: (a) Irene's husband died in December 1965. (b) On April 15, 1966, $ 95,000 was deposited to an account, opened at First Trust (No. 290-045-797) and styled "Estate of Edith Kelly, Edith Stretton, Administratrix." (c) Edith Kelly's will was offered for probate on October 14, 1969.↩
12. Neither party summoned Irene to testify, although no indication was given that she might be unavailable.↩
13. All section references are to the provisions of the Internal Revenue Code of 1954 in effect during the taxable years in issue. SEC. 6653. FAILURE TO PAY TAX. (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (c) Exceptions.-- (1) False Return.--In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
14. Taxable income is reconstructed under the net worth method by adding a taxpayer's personal expenditures to the amount by which his net worth increased and by reducing the sum thus computed by the amount which he realized from tax-exempt sources.↩
15. In this connection we note especially: Ernest's failure to disclose the existence of accounts No. 390-062028 and No. 390-037910; his failure to disclose the number of cars which he actually owned; the gross inaccuracy of his detailed description of his acquisition of Investors shares; and the inaccuracy with which he described petitioners' acquisition of their shares of stock in AT&T.↩
16. See footnote 13, supra.↩
17. See by way of contrast (C.A. 8, 1963), affirming in part and reversing in part a Memorandum Opinion of this Court; also (C.A. 7, 1956), affirming sub nom. . ↩
18. Ernest has been found willfully to have evaded tax by filing fraudulent returns. Therefore, he may not avail himself of the protection of the statute of limitations with respect to any of the years in issue. Sec. 6501 (c)(1). Nor may Edith. . Ernest alone, however, is chargeable with additions to tax under sec. 6653(b).↩